944 F.2d 1446
 60 USLW 2174, 1991 Copr.L.Dec. P 26,767,
19 U.S.P.Q.2d 1491
 ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, Plaintiff-Appellant,
v.
CREATIVE HOUSE PROMOTIONS, INC., Defendant-Appellee.
ACADEMY OF MOTION PICTURE ARTS AND SCIENCES, Plaintiff-Appellee,
v.
CREATIVE HOUSE PROMOTIONS, INC., Defendant-Appellant.
 Nos. 90-55006, 90-55144.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 4, 1991.
Decided July 31, 1991.
As Amended Oct. 2, 1991.
 
 Louis P. Petrich, Leopold, Petrich & Smith, Los Angeles, Cal., for plaintiff-appellant, cross appellee.
 Eric Olson, Halstead, Baker & Olson, Los Angeles, Cal., for defendant-appellee, cross appellant.
 Appeal from the United States District Court for the Central District of California.
 Before PREGERSON, HALL and BRUNETTI, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Appellant-cross-appellee Academy of Motion Picture Arts and Sciences ("the Academy") brought an action in the district court for copyright and trademark infringement and related state law claims against appellee-cross-appellant Creative House Promotions, Inc. ("Creative House") for marketing the "Star Award," a gold figure closely resembling the Academy's famous "Oscar" statuette. The district court concluded after a bench trial that the Oscar was not entitled to copyright protection because it had previously entered the public domain. The court also ruled against the Academy on its trademark infringement and related claims. The court found that (1) the Academy failed to show that recipients or viewers of the Star Award were likely to confuse it with the Oscar, and (2) the Academy failed to establish that the Star Award had diluted the Oscar's quality.
 
 
 2
 The Academy appeals the district court's rulings in favor of Creative House. We have jurisdiction under 28 U.S.C. § 1291, and we reverse. On cross-appeal, Creative House appeals the district court's denial of attorneys' fees, and the Academy seeks double costs for Creative House's failure to cite controlling authority. We affirm the denial of fees, and reject the Academy's request for double costs.
 
 BACKGROUND
 
 3
 The Academy was established by film industry leaders in 1927 to promote cultural, educational, and technological progress in general, and to advance motion picture arts and sciences in particular. In 1929, the Academy began its annual awards ceremony, in which it recognizes industry artists for outstanding achievement in their fields and bestows upon them the coveted "Oscar" statuette. The awards ceremony has been televised annually since 1953, and is seen across the United States and throughout the world. Pictures of the Oscar have been featured in the media since 1929.
 
 
 4
 From 1929 through 1941, the Academy claimed common law copyright protection for the Oscar as an unpublished work of art. Each of the 158 Oscars awarded during that time bore its winner's name, but did not display any statutory copyright notice. In 1941, the Academy registered the Oscar with the United States Copyright Office as an unpublished work of art not reproduced for sale. All Oscars awarded since that time contained statutory copyright notices. In 1968, the statutory copyright was renewed.
 
 
 5
 After securing the original copyright registration in 1941, the Academy restricted the manner in which winners could advertise their Oscars. Specifically, any advertisements featuring the Oscar had to identify the year and category in which the recipient won the award. The Academy also required recipients to give the Academy rights of first refusal on any intended sale of their Oscar. Before this time, the Academy had not placed any express restrictions on the use or disposal of the award.
 
 
 6
 In 1950, the estate of post-mortem Oscar recipient Sid Grauman offered Grauman's Oscar for sale at a public auction. No Oscar had previously been offered for sale. An Academy representative ultimately purchased the award.
 
 
 7
 In 1976, Creative House, a manufacturer and distributor of advertising specialty items, commissioned a trophy sculptor to design a striking figure holding a star in its hand. The finished product was a naked, muscular male figure closely resembling the Oscar, known as the "Star Award." Both the Star Award and the Oscar are solid metal with a shiny gold finish and stand on a circular gold cap mounted on a round base. The district court found only two significant differences between the two: the Star Award is two inches shorter than the Oscar, and holds a star rather than a sword.
 
 
 8
 Although Creative House initially produced the Star Award to honor its advertising agency client's "star" salespeople, it later sold the award to other corporate buyers. In the Chicago area, Creative House marketed the award directly to various corporate buyers through the Star Award incentive program. Under the program, corporate sales personnel who reached the highest level of achievement would receive the Star Award. In other areas of the country, the award was advertised in catalogs and single-page "cut sheets" and marketed through distributors. Most customers were corporate buyers who purchased the awards for employees as gifts.
 
 
 9
 In 1983, the Academy demanded that Creative House discontinue or significantly change the Star Award. Creative House refused. After negotiations between the parties broke down, the Academy filed suit for copyright infringement, false designation of origin under the Lanham Act, and unfair competition and trademark dilution under California law.
 
 
 10
 After a bench trial, the district court ruled, in a published opinion that the Oscar was not entitled to copyright protection because a divesting, general publication of the Oscar occurred before the 1976 Copyright Act's effective date of January 1, 1978, which triggered a loss of the pre-1941, common law copyright. Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc., 728 F.Supp. 1442, 1446-48 (C.D.Cal.1989).[1] In concluding that the Oscar had "entered the public domain" through a general publication, the court rejected the Academy's argument that publication of the Oscar had been limited to a select group of persons for a limited purpose.
 
 
 11
 On the trademark and related claims, the district court held that no violation of the Lanham Act, nor any unfair competition under California law, had occurred because the Academy had failed to show a significant likelihood of confusion among Star Award purchasers, Academy, 728 F.Supp. at 1451. The court also rejected the Academy's dilution claim after finding no proof that the Star Award had diluted the Oscar's quality or invaded its good will. Id. at 1452. Finally, the district court rejected Creative House's request for attorneys' fees because the company had failed to show any malicious or oppressive conduct by the Academy. Id.
 
 STANDARDS OF REVIEW
 
 12
 On the copyright issue, the question before us is whether the undisputed facts surrounding distribution of the Oscar support the district court's conclusion that a divesting, general publication of the Oscar occurred before 1941. That question is one of law, which we review de novo. See Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 201 (9th Cir.1989).
 
 
 13
 On the Lanham Act issue, we review the district court's finding regarding likelihood of confusion under the clearly erroneous standard. Eclipse Associates Ltd. v. Data General Corp., 894 F.2d 1114, 1116-17 (9th Cir.1990); Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1355 (9th Cir.1985) (en banc).
 
 
 14
 The standard of review for the pendant state law claims is de novo for questions of state law, and clearly erroneous as to conclusions regarding the likelihood of confusion. Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir.1988).
 
 
 15
 Finally, we review the district court's denial of attorneys' fees for abuse of discretion. Transgo, Inc. v. AJAC Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).
 
 DISCUSSION
 I. Copyright Validity
 
 16
 Under the Copyright Act of 1976 ("the 1976 Act"), 17 U.S.C. §§ 101-810, a copyrighted work is entitled to protection if it has not become part of the public domain prior to the Act's effective date of January 1, 1978. The district court ruled that the Oscar was not entitled to protection under the 1976 Act because it had entered the public domain through a general publication before it was protected by statutory copyright in 1941. The Academy attacks that ruling by arguing that the district court (1) failed to recognize and apply a presumption that the Oscar was a protected, unpublished work in light of its 1941 copyright registration certificate; and (2) erred in finding that a general publication of the Oscar occurred before January 1, 1978.
 
 A. Statutory Presumption
 
 17
 The Academy maintains that the Oscar's 1941 copyright registration as a work "not reproduced for sale" under § 11 of the 1909 Copyright Act raised a statutory presumption of copyright validity that the district court ignored. Essentially, the Academy argues that if the Oscar had been "published" (i.e., made available to the general public in a manner that resulted in a "general publication"--see Section IB, infra ) before 1941, it would not have been eligible for copyright under § 11; conversely, the fact the copyright was granted establishes that the Oscar had not been published before that date.
 
 
 18
 We agree that the district court erred in failing to afford the Academy's 1941 copyright a presumption of validity. Section 209 of the 1909 Act provides that a certificate of registration shall be prima facie evidence "of the facts stated therein." Although the "facts" stated in a certificate of registration are limited to the date, name and description of the work, and name of the registration holder, a majority of courts have held that § 209 creates a rebuttable presumption that the certificate holder has met all the requirements for copyright validity. See Gaste v. Kaiserman, 863 F.2d 1061, 1064-65 (2d Cir.1988); see also H.R. No. 94-1476, 94th Cong., 2d Sess. at 157 (1976), reprinted in 1976 U.S.Code Cong. & Admin.News, 5659, 5773 ("The principle that a certificate represents prima facie evidence of copyright validity has been established in a long line of court decisions, and it is a sound one."). In this case, the certificate of registration creates a rebuttable presumption that the Oscar was an unpublished work in 1941. As a result, Creative House bore the burden of showing that the Oscar entered the public domain before 1941.
 
 B. General v. Limited Publication
 
 19
 Under the common law, the creator of an artistic work has the right to copy and profit from the work, and can distribute or show it to a limited class of persons for a limited purpose without losing that common law copyright. Burke v. National Broadcasting Co., Inc., 598 F.2d 688, 691 (1st Cir.), cert. denied, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979). This sort of limited distribution is known as a "limited publication." If the creator exceeds the scope of a limited publication and allows the work to pass into the public domain, a "general publication" of the work occurs. At that point, unless the creator has obtained a statutory copyright,[2] anyone can copy, distribute or sell the work. Id. Although an artistic work may be exposed to the public by exhibition, by limited publication, or by general publication, only general publication triggers the loss of the creator's common law copyright. Id. The distinction between general and limited publication reflects an attempt by courts to mitigate the harsh forfeiture effects of a divesting general publication. American Vitagraph, Inc. v. Levy, 659 F.2d 1023, 1027 (9th Cir.1981). As a result, "it takes more in the way of publication to invalidate any copyright, whether statutory or common law, than to validate it." Id., quoting Hirshon v. United Artists Corp., 243 F.2d 640, 645 (D.C.Cir.1957).
 
 
 20
 The district court correctly determined that the Oscar did not become part of the public domain merely by being publicly displayed or presented at the award ceremonies. In general under the common law, mere performance or exhibition of an artistic work does not amount to a publication. Ferris v. Frohman, 223 U.S. 424, 435, 32 S.Ct. 263, 266, 56 L.Ed. 492 (1912); Burke, 598 F.2d at 691; cf. Letter Edged In Black Press, Inc. v. Public Bldg. Comm'n of Chicago, 320 F.Supp. 1303, 1309 (N.D.Ill.1970). Moreover, publishing pictures of the Oscar in books, newspapers, and magazines did not thrust the award into the public domain, because publishing two-dimensional pictures does not constitute a divesting publication of three-dimensional objects. See Kamar Intern, Inc. v. Russ Berrie and Co., 657 F.2d 1059, 1061-62 (9th Cir.1981).
 
 
 21
 Although merely displaying the Oscar to the public does not divest the award of common law copyright protection, Creative House argues that the Academy's distribution of the Oscar to 158 recipients between 1929 and 1941 without any express restriction on the use or sale of the award amounted to a divesting, general publication of the work. The Academy maintains that the Oscar's distribution was merely a limited publication.
 
 
 22
 A general publication occurs when a work is made available to members of the public regardless of who they are or what they will do with it. Burke, 598 F.2d at 691. In contrast, a publication is "limited"--and does not trigger the loss of a common law copyright--when tangible copies of the work are distributed both (1) to a "definitely selected group," and (2) for a limited purpose, without the right of further reproduction, distribution or sale. White v. Kimmell, 193 F.2d 744, 746-47 (9th Cir.), cert. denied, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952). We consider each element of White's two-part "limited publication" test separately.
 
 1. Selected group
 
 23
 As the district court concluded, "There is no question that the Academy has awarded the Oscar only to a select group of persons." The Academy distributes the coveted Oscar to performers and members of the motion picture industry selected for outstanding achievement. At the 63rd Annual Academy Awards held this year, for example, the film "Dances With Wolves" was chosen among hundreds as the best film of 1990; its director, Kevin Costner, was selected from a field of five distinguished directors as "Best Director" of the year.
 
 
 24
 The majority of performers in the industry will never receive an Oscar. More importantly, the Academy has never sold or distributed the award to the general public.
 
 2. Limited purpose
 
 25
 To meet the "limited purpose" prong of the White test, the Academy must show both (a) that the purpose of distributing the Oscar was limited; and (b) that Oscar recipients had no right of sale or further distribution--i.e., that their right of distribution was expressly or impliedly limited. See White, 193 F.2d at 746-47; Brown v. Tabb, 714 F.2d 1088, 1091 (11th Cir.1983) ("under the White test the requirement that there be no right of sale or distribution is separate from and in addition to the requirement that there be a limited purpose"). The district court found that the Academy's purpose was not sufficiently limited, and did not reach the second issue regarding distribution restrictions. We examine both requirements.
 
 
 26
 (a) Limited purpose
 
 
 27
 The district court ruled that the Academy's purpose in presenting the Oscar at its annual awards gala was not just to honor the distinguished recipients, but also to promote the film industry. The court noted that the Academy spends over $800,000 annually to promote the awards ceremony, and that recipients are allowed to advertise their Oscars, with certain limitations. Relying on Brown v. Tabb, 714 F.2d 1088 (11th Cir.1983), the court concluded that the Academy's purpose was not sufficiently limited because the Academy "exploited the Oscar" to promote the movie industry. We disagree.
 
 
 28
 The Eleventh Circuit decision in Brown involved a copyright infringement action brought by a composer who had sold several customized advertising jingles to car dealers. When a former dealership manager used the jingle to promote his own new dealership, Brown sued. The district court entered judgment for the defendant, ruling that the work was not entitled to protection under the 1976 Act because it had already entered the public domain. The court of appeals affirmed, holding that the distribution was not limited because Brown sold the jingle to any dealer willing to pay for it, and because each dealer was free to broadcast the jingle as broadly as he wished. Brown, 714 F.2d at 1092.
 
 
 29
 In the case now before us, the district court concluded that just as Brown exploited his jingle for pecuniary gain, the Academy exploited the Oscar to promote the movie industry. The district court's reliance on Brown, however, was misplaced. In Brown, the composer sold his jingle to anyone who paid for it, thereby enjoying " 'the more worldly rewards that come with exploitation of his work.' " Brown, 714 F.2d quoting 1 Nimmer § 4.03 at 15-16. The Academy, in contrast, has never sold the Oscar to anyone. In addition, while Brown widely distributed actual copies of his work, the Academy has never distributed the Oscar to anyone other than the recipients. The fact that Oscar winners are permitted to advertise the fact they won their award, or display pictures of it, does not amount to a distribution. See Kamar, 657 F.2d at 1062; American Vitagraph, 659 F.2d at 1027-28.
 
 
 30
 Moreover, unlike Brown, the Academy does not promote the Oscar for its own commercial benefit. While the film industry may benefit incidentally from the Oscar's promotion, indirect commercial benefits do not necessarily transform a limited distribution into a general publication where no direct sales of the work are involved. See, e.g., Brewer v. Hustler Magazine, Inc., 749 F.2d 527, 529 (9th Cir.1984) (business cards featuring a reproduced photograph distributed for employment purposes amounted to a limited publication); Hirshon, 243 F.2d at 645-46 (distribution of 2000 copies of song to broadcasting stations and musicians for "plugging" purposes was a limited publication); American Vitagraph, 659 F.2d at 1027 (screening movie to gauge audience reaction found to be a limited publication although small admission fee was charged). We therefore find that the Academy's purpose of advancing the motion picture arts and sciences is a limited one.
 
 
 31
 (b) Right of further distribution
 
 
 32
 Before 1941, the Academy did not expressly prohibit recipients from selling or disposing of their Oscars. After 1941, the Academy required recipients to give the Academy a right of first refusal on any sale of their award, and imposed various restrictions on advertising.
 
 
 33
 Although no express restrictions on recipients' use or distribution of the Oscar existed before 1941, we conclude that restrictions on further distribution were implied. We find support for our conclusion in the District of Columbia Circuit's decision in Hirshon v. United Artists Corp., 243 F.2d 640 (D.C.Cir.1957). In Hirshon, the D.C. Circuit held that distributing copies of a song to radio stations for promotional purposes was a limited publication even though further distribution was not expressly restricted. The court noted that not a single copy of the song was ever sold, that no one had been given permission to use the song, and that nothing had been done to give any recipient the impression that he could use the song without first obtaining a license. Id. at 645.
 
 
 34
 Similarly here, neither the Academy nor any living Oscar recipient has ever offered to transfer an Oscar to the general public. Each Oscar trophy is personalized with the name of the individual winner, reflecting the Academy's expectation that the trophy will belong to the recipient alone. Although the Academy has given Oscar recipients permission to advertise their awards, it has never given them permission to sell or distribute their Oscars. Finally, the Academy has done nothing to suggest that recipients are free to make copies of the Oscars and distribute them. Cf. Brewer, 749 F.2d at 529 (distribution of business cards deemed a limited publication even though recipients were free to further distribute the cards); King v. Mister Maestro, Inc., 224 F.Supp. 101, 107 (S.D.N.Y.1963) (oral delivery of King's "I Have a Dream" speech to vast audience found to be a limited publication even though press was given copies of speech for reprinting).
 
 
 35
 From 1929 until the end of the Oscar's common law copyright protection in 1941, the Academy distributed personalized Oscar statuettes to a select group of distinguished artists. The Academy did not sell or directly profit from the award, nor did it encourage its further distribution. Under the White test, the Academy's actions constituted a limited publication that did not divest the Oscar of its common law protection. We therefore reverse the district court's contrary ruling, and remand to allow the Academy to present evidence of copyright infringement.
 
 
 36
 II. Trademark Infringement Under The Lanham Act
 
 
 37
 The Academy contends that Creative House's sale of the Star Award violates § 43 of the Lanham Act, 15 U.S.C. § 1125(a). That section, which prohibits any "false designation of origin, or any false description or representation" in connection with any goods or services, precludes the use of another's distinctive trademark if it is likely to confuse the public as to the product's origin.
 
 
 38
 To be protected under the Lanham Act, a particular design must be both non-functional and have a secondary meaning. Here, the Oscar's sleek, muscular build and distinctive design is non-functional because an achievement award need not have those particular characteristics. The Oscar also has clearly acquired a secondary meaning--people throughout the world associate the award with excellence in film. Thus, the district court correctly concluded that the Oscar is entitled to protection under the Lanham Act.
 
 
 39
 Under § 1125(a), "the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1201 (9th Cir.1979). "Likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." Shakey's Inc. v. Covalt, 704 F.2d 426, 431 (9th Cir.1983); see also Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440, 443 (9th Cir.1980).
 
 
 40
 To determine whether a likelihood of confusion existed in this case, the district court applied the six-factor test laid out in J.B. Williams, Co., Inc. v. Le Conte Cosmetics, Inc., 523 F.2d 187 (9th Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976).[3] Those factors include:
 
 
 41
 (1) the strength of the mark;
 
 
 42
 (2) similarity in appearance, sound and meaning;(3) the class of goods;
 
 
 43
 (4) the marketing channels involved;
 
 
 44
 (5) evidence of actual confusion; and
 
 
 45
 (6) the defendant's intent in selecting the mark.
 
 
 46
 Id. at 191. We consider each factor in turn.
 
 
 47
 (1) Strength of the mark
 
 
 48
 A strong mark is "afforded the widest ambit of protection from infringing uses." AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 349 (9th Cir.1979). The district court correctly ruled that the Oscar could be considered "a relatively strong mark because it enjoys recognition among many members of our society," but then stated that this factor "must be considered in conjunction with the factor of likelihood of confusion."
 
 
 49
 By linking the sub-issue of mark strength with the overriding issue of likelihood of confusion, the district court improperly collapsed a single threshold factor into the ultimate question to be determined. See J.B. Williams, 523 F.2d at 192 (linking a threshold question such as mark strength with the issue of "confusing similarity" or "likelihood of confusion" is improper because it merges analysis of one of the preliminary inquiries with the ultimate issue). The district court's analysis of the Oscar mark's strength was erroneous. The mark should be given the strongest possible protection against infringement.
 
 
 50
 (2) Similarity in appearance
 
 
 51
 The district court's finding that the two awards "are very similar," apart from the different objects they hold and two inches in height, is not clearly erroneous. Indeed, the similarity in design, shape and finish between the two statuettes is striking.
 
 
 52
 (3) & (4) Class of goods and marketing channels
 
 
 53
 The district court noted that both parties distribute similar goods. But the court concluded that the channels of distribution were "entirely different" because the Academy presents the Oscar at its annual awards ceremony, while Creative House markets the Star Award either directly to corporate buyers or through distributors.
 
 
 54
 In taking such a narrow view of the relevant markets, the district court erred in two respects. First, it ignored evidence that Creative House's market extends to buyers in the entertainment field, and includes theater groups, cable television, and a film festival.
 
 
 55
 Second, by considering only the initial purchasers of the Star Award as the relevant market, the court overlooked the risk of post-sale confusion. Post-sale confusion occurs when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product. Here, initial Star Award purchasers (such as corporations buying the award for their "star" employees) would be exposed to Creative House's marketing presentations and literature, and would be less likely to confuse the Creative House product with the Academy's Oscar. But a large secondary audience--including Star Award recipients and individuals who see the award after it is presented--would see the award without any such clarifying marketing aids. As a result, this secondary audience might conceivably assume the Star Award was somehow associated with the Oscar. See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872-873 (2d Cir.1986) (post-sale confusion arises where consumers see similar, competing product outside retail store and clarifying labels have been discarded); Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir.1980).
 
 
 56
 (5) Evidence of actual confusion
 
 
 57
 At trial, the Academy offered independent survey evidence to establish that people who see the Star Award tend to confuse it with the Oscar. The survey, conducted in New York, Chicago, and Los Angeles, showed that 70% of white-collar professionals associated the Star Award with the Oscar.[4] The district court dismissed the survey evidence because it showed mere "association" between the goods rather than confusion as to the origin of the goods. The court also ruled that Star Award purchasers were not likely to confuse the origin of the Star Award because the purchasers would view the trophy within the context of Creative House marketing presentations.
 
 
 58
 The district court's analysis is flawed in several respects. First, the district court overlooked evidence presented by the Academy of actual confusion among the public, including (1) a newspaper article describing a Star Award presented to an Iowa theater manager as an Oscar, and (2) phone calls by Academy members who mistakenly believed that a Star Award bestowed on an actors workshop, which was pictured in a Daily Variety photo, was actually an Oscar. Evidence of such actual confusion "is persuasive proof that future confusion is likely." AMF, Inc., 599 F.2d at 352.
 
 
 59
 Second, as we explained above, the district court ignored the problem of post-purchase confusion. That is, while companies that initially purchase the Star Award are exposed to various Creative House marketing presentations, recipients and later viewers of the award are not. It is these individuals, who see the Star Award outside the context in which it is originally distributed, who may confuse the Star Award with the Oscar. See Levi Strauss, 632 F.2d at 822; Lois Sportswear, 799 F.2d at 873.
 
 
 60
 Third, in this circuit, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act. American Int'l Group, Inc., v. American Int'l Bank, 926 F.2d 829, 832 (9th Cir.1991). Likelihood of confusion will be found whenever consumers are likely to assume that a mark is associated with another source or sponsor because of similarities between the two marks. Shakey's Inc., 704 F.2d at 431. Thus, the Academy's survey evidence, which established that 70% of the Star Award's target population associated the Star Award with the Oscar, is sufficient to show a likelihood of confusion among consumers.
 
 
 61
 (6) Creative House's Intent
 
 
 62
 As evidence of Creative House's intent, the Academy offered advertisements boasting that the Star Award resembled an "internationally acclaimed award given to the most talented people in the country." The district court concluded that while this description obviously referred to the Oscar, the comparison was merely an attempt to make potential purchasers associate the Star Award with the Oscar, and that there was no evidence Creative House intended to confuse purchasers.
 
 
 63
 Once again, the district court's distinction between consumer association and confusion was unduly strict. When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived. AMF, Inc., 599 F.2d at 354. Thus, where evidence shows that one company deliberately adopted another's name to obtain advantage from the other's good will, we may infer a likelihood of confusion. Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 157-58 (9th Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963).
 
 
 64
 Because the district court erroneously applied several of the J.B. Williams factors, and because substantial evidence of likelihood of consumer confusion was presented, we reverse the court's conclusion that no violation of the Lanham Act occurred, and remand for further proceedings consistent with this opinion.III. Unfair Competition
 
 
 65
 An action for unfair competition under Cal.Bus. & Prof.Code §§ 17200 et seq. is "substantially congruent" to a trademark infringement claim under the Lanham Act. International Order of Job's Daughters, 633 F.2d 912, 916 (9th Cir.1980), cert. denied, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). Under both, the " 'ultimate test' " is " 'whether the public is likely to be deceived or confused by the similarity of the marks.' " Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir.1988), quoting New West Corp., 595 F.2d at 1201. See also Ball v. American Trial Lawyers Ass'n, 14 Cal.App.3d 289, 304, 92 Cal.Rptr. 228, 238 (1971) (even if the parties are not competitors, injury is established if the public is likely to confuse or associate the source of the goods).
 
 
 66
 Because the evidence establishes there is a likelihood of confusion among consumers between the Oscar and the Star Award, we reverse the district court's dismissal of the Academy's unfair competition claim and remand for further proceedings consistent with this opinion.
 
 IV. Unlawful Dilution
 
 67
 The district court rejected the Academy's claim for unlawful dilution under California's antidilution statute, Cal.Bus. & Prof.Code § 14330, because the Academy failed to show that Creative House's marketing of the Star Award "had diluted the quality of the Oscar" or invaded its good will. The court also found it "relevant" that the Academy suffered no monetary damage, and that the Academy has continually increased the television audience for its annual awards show during the time the Star Award has been sold.
 
 
 68
 To prevail under § 14330, the Academy need not show actual injury or likelihood of confusion. See Century 21, 846 F.2d at 1180; Levi Strauss, 778 F.2d at 1362. The Academy only needs to show that its business reputation is likely to be injured, or that the distinctive value of the Oscar mark is likely to be diluted. Century 21, 846 F.2d at 1180.
 
 
 69
 In considering the Academy's lack of money damages and the award show's increasing audience, the district court overlooked the underlying purpose of the dilution doctrine. The doctrine is designed to protect against the gradual "whittling away" of a trademark's value. 2 J. McCarthy, Trademarks and Unfair Competition § 24:13 (2d ed. 1984). The Oscar's value lies in its distinctive design, which stands as a well-recognized symbol of excellence in film. The Star Award, which is strikingly similar in appearance and was originally marketed as an award which resembles an "internationally acclaimed award," dilutes the Oscar's distinctive value.
 
 
 70
 Moreover, the Star Award is available to corporations, television stations, theater groups, and any member of the general public who desires to purchase one. If the Star Award looks cheap or shoddy, or is disseminated without regard to the ultimate recipient, the Oscar's distinctive quality as a coveted symbol of excellence, which cannot be purchased from the Academy at any price, is threatened. The district court therefore erred in concluding that the Academy could not sustain a claim under the California antidilution statute.
 
 V. Attorneys' Fees
 
 71
 The district court denied Creative House's request for attorneys' fees under Section 35 of the Lanham Act. A prevailing party may recover fees under this section only in "exceptional cases," 15 U.S.C. § 1117, such as where the opposing party is guilty of "extraordinary, malicious, wanton, and oppressive conduct." Transgo, Inc., 768 F.2d at 1026. The district court found no evidence of any such conduct here.
 
 
 72
 Creative House does not appeal the denial of fees under 15 U.S.C. § 1117. Instead, it argues that the district court erred by failing to award fees under the Copyright Act, 17 U.S.C. § 505. We have expressly held that attorneys' fees may be awarded under § 505 to a prevailing party on either side of the action, but that a prevailing defendant must show that the action was frivolous or brought in bad faith. Bibbero Systems, Inc. v. Colwell Systems, Inc., 893 F.2d 1104, 1108 (9th Cir.1990); Cooling Systems and Flexibles, Inc. v. Stuart Radiator, Inc., 777 F.2d 485, 493-94 (9th Cir.1985).
 
 
 73
 Creative House acknowledges this rule, but argues that we should abandon it because it holds prevailing defendants to a higher standard of proof than prevailing plaintiffs. We have previously rejected this argument, and held that any reconsideration of the standard must be made by our court sitting en banc. See Bibbero, 893 F.2d at 1109; Olson v. Nat'l Broadcasting Co., Inc., 855 F.2d 1446, 1454 (9th Cir.1988).[5]
 
 
 74
 Because Creative House did not show the Academy's action was frivolous or in bad faith, and because Creative House is no longer the prevailing party, we affirm the district court's denial of fees.
 
 CONCLUSION
 
 75
 We conclude that the Academy's sleek, muscular gold statuette known as "Oscar," which is recognized world wide as a distinctive symbol of outstanding achievement in film, and which the Academy awards to a select group of talented individuals for the limited purpose of promoting the motion picture arts and sciences, is entitled to protection under the Copyright Act of 1976. We also hold that the district court erred in ruling against the Academy on its Lanham Act, unfair competition, and unlawful dilution claims. We therefore REVERSE the district court's rulings on these claims and REMAND for further proceedings consistent with this opinion. Finally, we AFFIRM the district court's denial of attorneys' fees.
 
 
 
 [1]
 Because of differing protections between common law and statutory copyright under the 1909 Copyright Act, the concept of "publication" has become a legal word of art. 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 4.01 (1990). A publication is deemed to occur "when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur." American Vitagraph v. Levy, 659 F.2d 1023, 1027 (9th Cir.1981), quoting 1 Nimmer § 4.04 at 4-18 to 4-19. Under the Copyright Act of 1976, an act of publication which injects a work into the public domain before January 1, 1978 strips the work of its protection under both the common law and the 1976 Act. 1 Nimmer § 4.01[B] at 4-5 to 4-6
 
 
 [2]
 Once a creator obtains a statutory copyright, the common law copyright is extinguished. See Jones v. Virgin Records, Ltd., 643 F.Supp. 1153, 1158 (S.D.N.Y.1986); 2 M. Nimmer, Nimmer on Copyright § 7.16[A][c][ii] at 7-152 to 7-153 (1990). Here, the Academy's common law copyright in the Oscar was extinguished in 1941 when it obtained the copyright registration certificate. From that point on, the Oscar was protected by statutory copyright laws
 
 
 [3]
 This circuit recognizes several different tests of likelihood of confusion. See, e.g. Eclipse Associates, 894 F.2d at 1118 (no one test mandated); AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir.1979) (eight-factor test); Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir.1987) (five-factor test). We apply the six-factor test used by the district court
 
 
 [4]
 The survey was conducted as follows:
 After asking preliminary profile questions, the interviewer asked the person to look at the Star Award and asked what, if anything, came to mind. Fifty-five percent thought of the Oscar, and 10% associated the statuette with the film industry. If the person did not name the Oscar, the interviewer asked what name came to mind. Seventy percent responded "The Oscar."
 
 
 [5]
 Appellant argues that Appellee's failure to cite Bibbero and Olson constitutes a violation of Fed.R.App.P. 38, and asks us to award double costs, including attorneys' fees. Because other circuits have adopted the rule Creative House urges here, and because we specifically acknowledged that a future en banc court might want to consider the issue, see Bibbero, 893 F.2d at 1109, we deny Appellant's request