**FRUIT OF THE LOOM, INC.,**
Plaintiff–Appellant,

v.

**Ken GIROUARD, d/b/a Two Left Feet, Defendant–Appellee.**

No. 91–56338.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 1993.

Decided May 18, 1993.

**1360**

Floyd A. Mandell, Anthony J. McShane, Kattan Muchin & Zavis, Chicago, IL, for plaintiff-appellant.

Roy G. Weatherup, Haight, Brown & Bonesteel, Santa Monica, CA, for defendant-appellee.

Before: NOONAN and LEAVY, Circuit Judges, and TANNER *, District Judge.

NOONAN, Circuit Judge:

Fruit of the Loom, Inc. (FOL) brought suit against Ken Girouard, d/b/a Two Left Feet (TLF), contending that TLF had infringed its trademarks in violation of the Lanham Act, 15 U.S.C. § 1114(1); had used marks falsely indicating the origin of its goods in violation of 15 U.S.C. § 1125(a); was engaged in unfair competition with FOL in violation of California Bus. & Prof.Code, § 17200, *et seq.;* and had diluted FOL's marks in violation of Cal.Bus. & Prof.Code, § 14330.

After a bench trial on September 6, 1991 the district court found for the defendant. FOL appeals. We affirm.

## BACKGROUND

FOL is the owner of the trademark "FRUIT Of The LOOM," first registered by B.B. & R. Knight, Inc. in 1871 with the United States Patent Office and again on November 29, 1922 and transferred after that company's bankruptcy to B.B. & R. Knight Corporation on September 27, 1926 and thereafter on April 13, 1962 assigned to FOL. This mark is registered as applied to "men's and boys' dress and negligee shirts; boys' blouses; kitchenette aprons; women's and children's textile underwear and pyjamas

for men, women, boys and girls." FOL is also the owner of a trademark registered on June 2, 1959 for FRUIT Of The LOOM with an apple and grapes below the words. The mark is registered for "men's, women's, girls' and boys' underwear, including T–Shirts, undershirts, undershorts, panties, slips, ties, brassieres, and corsets; men's, women's, girls' and boys' hosiery, socks, sweaters, pyjamas, jackets, slacks, and shorts; shirts; neckwear; blouses; sweatshirts; dresses; dusters; smocks, housedresses; maternities; aprons; workclothes; gym trunks; swim trunks; trousers; negligees; infants' garments and playwear; bathrobes; handkerchiefs; diapers; training pants, and diaper covers." This mark was held by a Rhode Island corporation also named Fruit of the Loom, Inc., and assigned (presumably with the business) to Dew Loom, Inc. in 1962. Dew Loom apparently became FOL.

The trademark FRUIT Of The LOOM with a symbol of an apple with grapes above the words was registered by FOL with the Patent Office on June 6, 1971 for "clothing for men, women and children namely, underwear, lingerie, dress shirts, sport and knit shirts, slacks, pants, jeans, shorts, blouses, pajamas, sleepers, waterproof pants, bibs, aprons, gym shorts and play suits, bloomers, robes, ties, belts, gloves, handkerchiefs, scarfs, raincoats, capes, and jackets, socks, hosiery, leotard tights, shoes, sneakers, boots, and rubbers." FOL also registered the mark of FRUIT Of The LOOM below an apple surrounded with grapes with the Patent Office on April 12, 1983 for essentially the same goods listed in the preceding application. A fifth mark, registered with the Patent Office on June 8, 1971, is simply the apple surrounded by leaves and grapes.

TLF was started by Ken Girouard in 1989 after he had lost his job with the New York advertising agency, Ogilvy & Mather. He began the business in a gardening shed in Malibu, California where he produced thongs he called "FRUIT FLOPS." They are purchased from another company and adorned by hand with plastic and lacquered fruit, faux

---

* The Honorable Jack E. Tanner, United States District Judge for the Western District of Washington, sitting by designation.

pearls, and silk flowers. His brief on appeal describes the product as "undeniably campy and frivolous." TLF does de minimis advertising (not di minimus as one brief mangles this Latin phrase). FRUIT FLOPS are sold to consumers at $35.00 to $45.00 a pair, mostly in boutiques, although also in a few department stores such as Nordstrom's. They have been described by the *Los Angeles Times* as "the couture end of the zorries' [i.e. thongs'] scale."

TLF also produces what are described as "bustiers," a term so recently imported from France into English usage as not yet to be recognized by Webster's International Dictionary. As produced by TLF it describes a strapless garment to be worn by women beneath their breasts and outside a top. Girouard has chosen to make what his brief describes as a double or triple entendre by calling these articles FRUIT CUPS. Like the thongs they are decorated with plastic fruit. They are sold to consumers for $46.00, generally in boutiques. They have been purchased by Bette Midler and other professional singers, customers indicative of their special market and appeal.

FOL saw TLF as appropriating its marks and brought this suit.

### FINDINGS OF FACT

The district court's findings of fact were as follows (as the findings were delivered orally, the numbering is supplied by this court):

1. "FRUIT Of The LOOM" is an old and strong mark.

2. "FRUIT" by itself is an arbitrary mark in the apparel industry and consequently is a strong mark. It, however, is not as strong as "FRUIT Of The LOOM." "It isn't even close." It is "embryonic" as compared to "FRUIT Of The LOOM." It is not strong enough to be protected under the California Anti-dilution statute.

3. In the past FOL licensed manufacturers of thongs and women's tops (not bustiers). At the time of trial FOL was neither manufacturing nor licensing bustiers or thongs. FOL was in the process of contracting to license the production of bras, but bras are not the functional equivalent of TLF's

bustiers because they are worn inside other clothing.

4. The marks of FOL and TLF "do not look alike, do not sound alike and certainly do not have the same meaning." That is especially true because the TLF mark "is the great majority of time appended, affixed or attached to its product."

5. No evidence of actual confusion exists.

6. Almost no overlapping of marketing channels occurs. TLF distributes to approximately 1,000 outlets, which were "chic, fashionable, trendy specialty stores and/or boutiques." FOL does not use such channels. There is a small amount of overlap as to department stores.

6. Given the price of TLF's products, they are purchased "for a fashion statement" not for the utilitarian purposes for which FOL's products are bought. They are chosen with care.

7. FOL did demonstrate that it had produced similar goods before and that there was a likelihood it would enter the market again.

8. No evidence that TLF intended to deceive exists.

9. "[N]o likelihood of confusion as to the source, sponsorship or approval" exists.

10. No kind of mental association exists in a reasonable buyer's mind between "FRUIT Of The LOOM," as used by FOL, and FRUIT CUPS and FRUIT FLOPS, as used by TLF.

As is typical in trademark and dilution cases, the court's findings of fact were readily translatable into conclusions of law, here fatal to the plaintiff's case. FOL appeals.

### ANALYSIS

■ The standard of review goes a long way towards deciding the case, because we must defer to the findings of fact of the district court and not reverse unless we have a firm and definite conviction that the court erred. *Levi Strauss & Co. v. Blue Bell*, 778 F.2d 1352, 1356 (9th Cir.1985) (en banc). The rule laid down in *Levi Strauss* as to trademark infringement cases is equally ap-

plicable to dilution cases. From this perspective we review the objections made by FOL to the district court's findings.

First, FOL pitches its case on the California Anti-dilution Statute, Cal.Bus. & Prof. Code § 14330, which reads as follows:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

FOL points to evidence in the record that TLF "does virtually no product testing for safety or quality," and, noting that the district court made no finding of fact in this regard, argues that TLF "could tarnish the goodwill and reputation" associated with FOL's marks. FOL strengthens this argument by pointing to testimony that FRUIT is a dominant part of the FRUIT Of The LOOM mark. It points also to the district court's acknowledgment that FRUIT alone was a strong mark.

Second, FOL attacks the district court's ultimate finding of fact that confusion between its marks and TLF's products is unlikely. Its strongest contention is that FOL's past business experience shows that it may well expand into the markets now used by TLF and that TLF may expand into its markets. FOL also doubts that the prices of TLF's products in the $36–$46 range would count as expensive in the upscale stores in which they are sold; so, FOL argues, they would not be purchased with care.

These contentions are well-argued and well worth consideration. They fail to persuade.

■ As to FOL's first point, there can be little doubt that its old trademark, FRUIT Of The LOOM, is not at all close to TLF's FRUIT FLOPS and FRUIT CUPS. The mind of any reasonable purchaser sees the phrase "FRUIT Of The LOOM" as a whole. It is this phrase as a unit that is justly recognized as a famous American trademark. *See,* Arnold B. Barach, *Famous American Trademarks* (1971) 67–68. The generic term

"FRUIT," meaning the product or result of effort, gets its special force in the mark from its association with "LOOM," the generic machine that produces a woven cloth. There is an effective play between the suggestion of nature in "FRUIT" and the suggestion of industry in "LOOM." The two key words also balance each other with their double vowels. The ordinary "FRUIT" is set off by the less than ordinary "LOOM." It is the combination of the terms that constitute FOL's distinctive mark. The apple and grapes are embellishments that do not have an independent strength. We cannot find the district court clearly erroneous in its finding that FRUIT Of The LOOM was not diluted by FRUIT CUPS or FRUIT FLOPS.

But, FOL presses, FRUIT was found by the district court to be a strong mark, and therefore it alone should be protected by the anti-dilution statute. However, as Professor McCarthy observes, "Value judgments about the 'strength of a mark' sufficient to be diluted are difficult to make." *McCarthy on Trademark and Unfair Competition* § 24.14 (2nd ed. 1984 and 1991 Supp.). The district court, with express ambivalence, did call FRUIT a strong mark in the apparel industry; but the district court effectively undermined this finding by holding that FRUIT was not strong enough to deserve protection under the California law. The district court added that "FRUIT" was "not even close" in strength to "FRUIT Of The LOOM," that indeed as a mark it was "embryonic." There is not even a hint in *Famous American Trademarks* that "FRUIT" is a variant of FRUIT Of The LOOM. We do not have the firm and definite conviction that the district court erred in its careful discrimination in the differences in strength of the two marks and its factual conclusion that FRUIT is not strong enough alone to qualify for protection.

It may or may not be too much to say, as *McCarthy* § 24.14 does, that a mark to be protected against dilution must be not only distinctive but famous. TIFFANY, POLAROID, ROLLS ROYCE, and KODAK are his examples of protectable marks that have in fact been protected. We have protected "CENTURY 21," the national brokerage network, against dilution. *Century 21 Real Es-*

*tate v. Sandelin,* 846 F.2d 1175, 1189 (9th Cir.1988). We have also protected the celebrated "OSCAR" of the Motion Picture Academy. *Academy of Motion Picture Arts and Sciences v. Creative House Promotions,* 944 F.2d 1446 (9th Cir.1991). We need not decide the exact degree of strength a protectable mark must reach, but it must at least be mature and well-known. "FRUIT" is far from being in the class we have recognized.

Further, if "FRUIT" by itself fell within the protected domain, it could be protected under the Anti-dilution statute against all users, not merely those in competition with FOL. The humble, humdrum word FRUIT would be barred from use by the Fruit Basket, The Fruit Gallery, and Fruit King, to name only three businesses currently listed in the San Francisco telephone directory. FOL would sweep clean the many business uses of this quotidian word.

There is an additional reason why FOL's dilution claim fails. As McCarthy explains the purpose of anti-dilution law, it is directed against the whittling away of plaintiff's mark, *McCarthy,* § 24.13. We have accepted that rationale. *Academy,* 944 F.2d at 1457. Whittling away will not occur unless there is at least some subliminal connection in a buyer's mind between the two parties' uses of their marks. *McCarthy,* § 24:13. Such connection is not the same as likelihood of confusion but it does require a threshold showing of some mental association between the protected mark and the alleged diluter. The district court found that there was not such a threshold association between FOL's "FRUIT" and TLF's whimsical gewgaws.

Because "FRUIT" was found without clear error to be not strong enough to qualify for protection against dilution and because the finding of a lack of mental association of FRUIT with TLF's products was not clearly erroneous, we cannot reverse the district court. Evidence of TLF's quality controls is not relevant if there is no association of its products with FOL. We turn to the charge of trademark infringement.

■ Of the eight criteria of likelihood of confusion set out by *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979),

the district court found two to favor the plaintiff: the strength of FOL's marks and the likelihood of expansion of the two companies into each other's markets. As to the other six criteria, the district court found in favor of TLF. There was no present proximity of goods. The market channels were different. Purchasers will buy TLF's goods with care. There was no evidence of actual confusion. There was no intent by TLF to deceive. The marks are dissimilar in sound, sight, and meaning. FOL points to no evidence that moves us to a clear and firm conviction that the district court erred in these findings of fact or in its ultimate finding of fact that there was no likelihood of confusion. So no injunction should issue.

At the same time that we decide this appeal we decide *Pacific Telesis Corp. v. International Telesis,* 994 F.2d 1364 (9th Cir. 1993), upholding an injunction against trademark infringement. A reader of the two cases might conclude that trademark and dilution cases are won or lost in the district court while the appellate court anoints the victor. True, these kinds of cases are fact-driven, and facts are found by the fact-finder. The amount of FOL's advertising—$58 million a year—does not kick in to help it, as the amount of its advertising helped Pacific Telesis, because the district court here found, without clear error, that what FOL had established was FRUIT Of The LOOM, not FRUIT, while Pacific Telesis advertising kept before the public the term, "TELESIS." That "FRUIT" might conceivably have been found to have been as dominant in FRUIT Of The LOOM as TELESIS was found to be in PACIFIC TELESIS does not alter the fact that it was not so found to be by the district court. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291–92 (9th Cir. 1992).

Appellate review does assure consistency in the circuit. The salient differences between the *Telesis* case and this one are these: the strength of the term "telesis" taken by itself, in comparison with the more common word "fruit"; the similarity in sight, sound and meaning of "Telesis" in both Telesis companies' marks, compared with the differences in sight, sound and meaning in

the marks in this case; the identity of products and markets in which the Telesis companies competed, compared with the different products and marketing channels here; and, climactically, the difference between International Telesis' intent to appropriate the good will of Pacific Telesis, compared with the innocence of TLF here.

**AFFIRMED.**