**PACIFIC TELESIS GROUP, a Nevada corporation, Plaintiff–Appellee,**

v.

**INTERNATIONAL TELESIS COMMU-NICATIONS, a California corporation, Defendant–Appellant.**

No. 91–55866.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 5, 1993.

Decided May 18, 1993.

William J. Robinson, Graham & James, Los Angeles, CA, for defendant-appellant International Telesis Communications.

Andrew J. Belansky and David A. Dillard, Christie, Parker & Hale, Pasadena, CA, for plaintiff-appellee Pacific Telesis Group.

Before: NOONAN and LEAVY, Circuit Judges, and TANNER,[*] District Judge.

NOONAN, Circuit Judge:

In 1988, Pacific Telesis Group (PTG) brought an action against International Telesis Communications (ITC) for infringement of its service mark in violation of the Lanham Act, 15 U.S.C. § 1114 and Cal.Bus. and Prof. Code § 14400; for false designation of origin contrary to the Lanham Act, 15 U.S.C. § 1125(a); and for unfair competition contrary to Cal.Bus. and Prof.Code § 17200. The district court found these violations to have occurred, 795 F.Supp. 979. We affirm.

### FACTS

PTG was formed in 1983 in anticipation of the court-mandated break-up of American Telephone and Telegraph Company. It was to take over the businesses of AT & T's regional subsidiary, Pacific Telephone and Telegraph Company, and Pacific Telephone's subsidiary, Bell Telephone Company of Nevada. It was incorporated on October 26, 1983 and became the holding company for the operating companies in California and Nevada. Its subsidiaries were Pacific Bell, Nevada Bell, Pac Tel Publishing, Pac Tel Communications Services and Pac Tel Mobile Access.

Prior to the incorporation of PTG, the executives of Pacific Telephone had selected Pacific Telesis Group as the name for the new holding company. On August 5, 1983, Pacific Telephone distributed to customers in California, and Nevada Bell distributed to customers in Nevada, an advertisement for "Telesis" telephone services such as call-for-warding, call-waiting, and 3–way calling. On August 8, 1983 Pacific Telephone filed an application for federal registration of TELESIS as a service mark, and on September 11, 1983, the United States Patent and Trademark Office issued the registration for communications services, "namely telephone services." In the fall of 1983 the mark was similarly registered as a California service mark. At the beginning of 1984 these marks were assigned by Pacific Telephone with its business to PTG.

Simultaneous press conferences in San Francisco and Reno on August 8, 1983 announced the selection of "Pacific Telesis Group" as the name of the new holding company. An advertisement in the *San Francisco Chronicle* on August 7, 1983 announced:

Pacific Telephone gives birth to a new family of companies: Introducing Pacific Telesis Group

PTG was then described and the full name repeated six times. The dictionary definition of "telesis" was given: "progress intelligently planned and directed."

Thereafter, from September 1983 through January 1984, advertisements were run in the *Wall Street Journal, Barrons, Business Week, Forbes, Fortune, Newsweek* and *Time,* using the full name of PTG and describing its goals. The ads typically put "Pacific Telesis" in larger type than "Group." "Pacific" and "Telesis" were equally emphasized. The advertising was addressed both to potential investors and potential customers. Its cost was approximately $2.5 million.

Advertising of PTG's full name continued in the same national publications into 1986 with the aim of increasing recognition of the name. Through 1984 and 1985 PTG also sponsored the "Nightly Business Report" on 260 Public Broadcasting Stations. The program was regularly seen by approximately two million people. The full name of the sponsor was given. From September 1985 into 1989, PTG ran a series of commercials on television in the major metropolitan cen-

---

[*] The Honorable Jack E. Tanner, United States District Judge for the Western District of Washington.

ters of California. The combined print and television advertising of PTG's name from 1984 through 1989 cost close to $50 million. In the same period the subsidiaries of PTG spent about $290 million. In this advertising in print, on the radio, and on television, each subsidiary was identified by its own name and as "A Pacific Telesis Company."

The break-up of AT & T and the development of telecommunications technology in the 1980s led to the development of the business of consulting on telecommunications, a business conducted by PTG subsidiaries and by consultants independent of the telephone companies. Pacific Bell presents its account teams as advisors, problem solvers, and strategic planners. They will design voice and data networks. Pac Tel Connection, a division of Pac Tel Communications Systems, offers the design of voice and data networks. Pac Tel Cellular and Pac Tel Paging, the successors of Pac Tell Access, not only provide cellular phones and paging but advise on their design and use in a system. In 1984 PTG also formed Pacific Telesis International. For the first three years of its existence this company offered telecommunications consulting services overseas. From 1987 onwards it has continued to do consulting work but has also developed overseas telecommunications projects in which it might acquire ownership. It, too, is known as "A Pacific Telesis Company."

ITC, the defendant, was incorporated in California in October 1985. Its founder, David Zweiban, testified that in 1983 and 1984 he had used the name "International Telesis Group" to describe and promote his telecommunications consulting business in England and the United States. He also testified that he was unaware of PTG's service mark before he used "Telesis" in combination with "International" and that he did not hear of the name "Pacific Telesis" until late 1985 or early 1986. Nonetheless, he admitted that in April 1985 he attended a trade show sponsored by Pacific Telesis, which in announcing its presentation of the show described itself as "A Pacific Telesis Company."

On November 24, 1986 Zweiban applied for federal registration of the service mark "International Telesis Group." In this application he declared "the service mark was first used in connection with the services" on November 30, 1985 and was first used in interstate commerce on November 17, 1986. On December 4, 1986 Zweiban registered with the state of California "International Telesis Group" as a service mark. In his application he stated the date the mark had been first used in California or anywhere was October 30, 1985. The first advertisement in which the term "Telesis" appeared for ITC was the December 1985 issue of *Mercury,* a publication of the Los Angeles Athletic Club.

The services provided by ITC, according to an advertisement in the record, are, generally, "Voice and Data Communication Consulting Services." More particularly, they are:

"Telecommunications Planning for New Facilities

Building Cabling and Riser System Design

PABX Selection and Implementation

Integrated Voice, Data, Cabling Systems

Private Satellite, Microwave, and Fiber–Optic Network

Electronic Mail and Document Delivery Systems"

ITC offers its services to a broad spectrum of potential customers, including airlines, banks, law firms, utilities and universities, and addresses its sales pitch not only to telecommunications managers, but to auditors, bankers, lawyers and sales directors.

### PROCEEDINGS

PTG brought this action on March 25, 1988. A bench trial, lasting 12 days, began on April 9, 1990. On July 16, 1991 the district court entered findings of fact and conclusions of law and held that ITC's "use of the mark TELESIS constitutes a federal and state of California service mark infringement, federal false designation of origin and state of California trademark infringement and unfair competition." The district court accordingly enjoined ITC from "using in any way the service mark 'TELESIS' or any other name or mark confusing or similar to TELESIS, alone or in combination with other words or designs, in connection with the

advertising, offering, or performing of voice and telecommunications consulting services, or other business activities relating to telecommunication."

Salient findings of facts by the court were as follows:

14. David Zweiban, now president of defendant corporation, made several previous declarations, in writing, under penalty of perjury that the first use of the name International Telesis Group in connection with telecommunications consulting services in the United States was in 1985.

15. Mr. Zweiban was fully aware of plaintiff's adoption of TELESIS prior to any use by him of TELESIS in any combination with International.

.      .      .      .      .

17. The services offered by plaintiff's subsidiaries substantially overlap the areas of communication technology in which defendant offers its consulting services.

.      .      .      .      .

20. ...

TELESIS is the dominant component of plaintiff's service marks and trade name. TELESIS does not describe any characteristics, functions, uses or qualities of telecommunications services. As applied to such services, it is arbitrary.

b. *Proximity [of] the services.* The areas of telecommunication technology offered by plaintiff's subsidiaries overlap the telecommunications services as to which defendant offers consulting services.

c. *Similarity of marks/names.* Defendant uses the identical dominant component "telesis" in its name(s).

d. *Evidence of actual confusion.* There was no evidence of actual confusion presented at trial.

e. *Marketing channels used.* There is virtually a complete overlap of existing or potential customers in that defendant has offered its telecommunications services to small, medium and multi-branch large concerns, most of which are in California.

f. *Likely degree of purchaser care.* There is a wide range in the level of sophistication among those concerns selecting telecommunications services, consisting of customers with little or no telecommunications experience and others with vast experience and knowledge.

g. *Defendant's intent in selecting the mark/name.* Defendant selected the use of TELESIS with the intent to benefit from the goodwill and reputation acquired by plaintiff through its prior use of TELESIS.

h. *Likelihood of expansion.* Because of the present overlap of the telecommunications areas in which plaintiff and defendant offer services, this factor is not viewed as significant in the likelihood of confusion analysis.

21. ... [P]laintiff has established by a preponderance of the evidence that there is a likelihood of confusion resulting from defendant's use of Telesis in relation to the telecommunications services which it offers.

ITC appeals.

## ANALYSIS

ITC has an uphill battle because of the standard of review. It is now firmly established that we review a district court's finding of likelihood of confusion and reverse only if the district court's finding was clearly erroneous. *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1356 (9th Cir.1985) (en banc). This conclusion means that we must accept the trial court's findings unless we are left with the definite and firm conviction that a mistake has been made. *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). ITC attempts to avoid this standard by contending that "similar deference is not owed to the district court's consideration of the factors used to make the finding." For this proposition, ITC cites *Clamp Mfg. Co., Inc. v. Enco Mfg., Inc.,* 870 F.2d 512, 515 (9th Cir.1989). This citation is not only unsupported by the case cited; it is a patent misreading of *Clamp,* which says the opposite. Once upon a time the Ninth Circuit was criticized for inconsistency in reviewing

trademark cases. *McCarthy on Trademarks & Unfair Competition* § 23.22 (2nd ed. 1984). Since *Levi Strauss,* the Ninth Circuit has been consistent: only clear error will justify reversal.

After its regrettable miscitation of *Clamp,* ITS makes a spirited series of arguments that there is clear error. We review them in terms of ascending strength.

*First, the seniority of the mark.* ITC does not abandon its trial position that Zweiban used the mark first and even has the audacity to maintain that Zweiban was not found by the district court to be not credible. Building on this contention, ITC argues that there is "no fundamental fact-finding upon which to properly infer an intent to infringe."

*Second, the character and strength of PTG's mark.* ITC points out that PTG's "company signature was distinguished by its typography and coloring and by use of the Bell symbol." It argues that "Pacific" was the dominant portion of the mark. It says that the ads featuring "Pacific Telesis Group" were mainly directed to investors, not consumers. It adds that no one bought PTG's services by asking for "Telesis."

*Third, the difference in services offered.* The services ITC offers, it maintains, consist in the advice of advisors independent of the telephone company. It contends that such services are fundamentally different from the consulting given by PTG to its customers. It says that PTG and its subsidiaries in their own marketing recognized that independent telecommunications experts were a group outside the company and functionally different from it.

*Fourth, the degree of purchaser care.* ITC notes that the district court found that there would be unsophisticated purchasers of telecommunications services, but the district court made no finding as to the deliberation with which customers would buy such services. It notes that purchasers of services are normally much more careful than purchasers of goods because they will have to interact with the service provider. It adds that the services offered by ITC were expensive and suggests that none would have bought them without knowing exactly from whom they were buying. It says that no actual confusion was proved and there was no probability of confusion.

In general, ITC taxes the district court with mechanically applying the criteria for likelihood of confusion set out in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979), and failing to assess the whole complex of activity as a unity.

To these objections, the following responses may be made:

■ 1. *The seniority of the mark.* The district court had before it Zweiban's statements made under oath in his application for the registration of the service mark federally and with California. The district court believed these statements rather than Zweiban's testimony and the testimony of his witnesses. To say that the district court did not make a judgment that Zweiban's testimony was "not credible" is to overlook the clear choice the district court had to make between his testimony and his earlier sworn statements. We will not substitute our judgment of credibility for that of the district court.

■ 2. *The character and strength of PTG's mark.* Beginning in the fall of 1983 PTG spent millions of dollars in advertising to educate investors and consumers about itself. Contrary to ITC's contention, not all of this advertising was targeted at investors. The advertising campaigns included descriptions of "TELESIS" telephone services available to consumers. The advertising presented PTG's subsidiaries' products and services to the marketplace.

■ On the face of the mark, "PACIFIC" and "TELESIS" are equally arbitrary and equally strong. According to the New Oxford Dictionary, "telesis" was coined in 1896 by Lester F. Ward. The Greek means simply "event" or "fulfillment." Ward gave the word a positive spin by declaring that it meant progress directed by intelligence. An autodidact and pioneer sociologist, Ward was struck by the arbitrariness of words in developed languages. Ward, *Pure Sociology* (1910). Having created "telesis," he devoted the third part of this large work to "social telesis," meaning the conscious direction of the evolution of society. A modern person,

however, would more readily associate the term with *tele* meaning "distant," as used in "telephone," and think that "telesis" referred to a system of distance communications. It is indeed Zweiban's testimony that he coined the word with these associations in mind.

"Telesis" in Ward's sense was rarely employed and so infrequently used in speech that most people have had to guess at its proper pronunciation. The only major usage the word has ever had in modern times has been in connection with PTG. Thus we have a situation where a word in its dictionary sense is arbitrary as used in a mark, but little more than an acronym as used in connection with the business using the mark. Perhaps the usage should be called a pun and therefore more arbitrary than descriptive. It is a close call. As a matter of factual judgment, we are not in a position to say that the district court was clearly wrong in finding "TELESIS" to be the dominant part of PTG's mark.

■ 3. *The similarity of services.* ITC's contention that it offers a different service was answered in the analogous situation of *Yellow Pages Cost Consultants, Inc. v. GTE Directories, Inc.,* 951 F.2d 1158 (9th Cir. 1991). The plaintiffs offered advice on how to advertise effectively and efficiently in the Yellow Pages directories. GTE Directories, which put out the Yellow Pages directories, entered into the business of providing such advice themselves. The plaintiffs contended that GTE was violating the Sherman Act. GTE argued that the key fact was that GTE could not compete with the independent consultants because the advice the consultants offered was independent. *Id.* at 1160. We rejected that contention, noting that, although the consultants might advise the customers to spend less, and GTE advise to spend more, they were both in the same market. *Id.* at 1161. We added that the independent consultants and GTE were competitors as they each imposed on the other a discipline in providing consumers with a better product at a lower cost. *Id.* at 1162. The situation here is similar. PTG and ITC are in competition in providing advice on the use and development of telecommunication services.

4. *The care exercised by purchasers.* PTG offered no evidence disproving ITC's contention that buyers of its services would exercise considerable care in determining their origin.

■ If the last factor alone were decisive, it would undermine the district court's factual conclusion that there was likelihood of confusion. But the district court's ultimate factual finding is supported by its finding on the character and strength of the mark owned by PTG; by its finding on the similarity of the services offered and the markets addressed; and by its findings on PTG's priority in use of the mark and ITC's attempt to get the benefit of the goodwill and reputation acquired by PTG. The law has long been established that if an infringer "adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities. Since he was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy is highly persuasive." *Restatement of Torts,* § 729, Comment on Clause (b)f (1938). This teaching, now over a half century old, was restated with approval only last year. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1293 (9th Cir.1992). Considered as a unity, the constellation of facts found by the district court coheres in the ultimate factual finding of likelihood of confusion. At the very least we are not left with a firm and clear conviction of error.

■ The ultimate factual finding of the district court is translatable into the legal conclusion that ITC has violated the Lanham Act by using PTG's registered service mark in connection with the offering of services in a way "tending falsely to describe or represent" the mark, 15 U.S.C. § 1125(a), and "likely to cause confusion." 15 U.S.C. § 1114(1). As likelihood of confusion is sufficient grounds for an injunction under the Lanham Act, we have no occasion to determine California law. *Id.*

ITC also challenges the district court's failure to admit certain documents belonging to

PTG, which ITC claims were given up with a waiver of privilege. ITC's evidence of a waiver is unpersuasive. The exhibits were properly excluded.

AFFIRMED.