**PENGUIN BOOKS U.S.A., INC., Foundation for "A Course in Miracles, Inc.", and Foundation for Inner Peace, Inc., Plaintiffs,**

v.

**NEW CHRISTIAN CHURCH OF FULL ENDEAVOR, LTD., and Endeavor Academy, Defendants.**

No. 96 Civ. 4126(RWS).

United States District Court, S.D. New York.

Oct. 24, 2003.

546

Epstein, Becker & Green, Boston, MA (John J. Rosenberg, Carrie J. Fletcher, of counsel), for Plaintiff Foundation for Inner Peace and Foundation for "A Course in Miracles," Inc.

Lawrence E. Fabian, New York, NY, for Defendants.

## OPINION

SWEET, District Judge.

The plaintiffs Foundation for A Course in Miracles, ("FACIM") and Foundation for Inner Peace ("FIP") seek to enforce their copyright in *A Course in Miracles* (the *"Course"* or the "Work"), against the defendants New Christian Church of Full Endeavor, Ltd. ("NCCFE" or the "Church") and Endeavor Academy (the "Academy"). After the completion of the prior proceedings a non-jury trial was held from May 19, 2003 to May 21, 2003. Upon all the prior proceedings and the following findings of fact and conclusions, judgment will be entered in favor of the defendants dismissing the copyright.

This litigation involves extraordinary materials and deep-seated convictions which have transformed a copyright action into issues of faith and commitment and required the examination of events which

occurred over a quarter of a century ago. The preponderance of the credible evidence has established that the plaintiffs' predecessors in interest distributed the *Course* before its publication.

### The Parties

FIP is a New York corporation with its principal place of business in California. It first published the *Course* with a copyright notice on October 6, 1975, transferred the copyright to Penguin Books U.S.A., Inc. ("Penguin")[1] in 1995 for a five-year period, and transferred its rights to FACIM in February 1998.

FACIM is a New York corporation with its principal place of business in Roscoe, New York.

The Church is a Wisconsin corporation with its principal place of business in Wisconsin Dells, Wisconsin.

Endeavor is a teaching facility with its principal place of business in Reedsburg, Wisconsin.

### Prior Proceedings

Penguin filed the original complaint in this action on June 3, 1996 to enforce their copyright in the Work. Defendants initially proceeded *pro se*, but were ordered on January 24, 1997 to retain counsel. FIP and FACIM joined as plaintiffs, and discovery proceeded.

In their third amended complaint, plaintiffs also assert as their second through sixth claims for relief, violations of the Lanham Act of 1946, 15 U.S.C. § 1051, *et seq.* This Court possesses subject matter jurisdiction over those claims under 28 U.S.C. §§ 1331, 1338(a), and 1338(b). These claims have been stayed pending the outcome of the primary copyright claims.

On February 3, 2000, Penguin and the plaintiffs moved for a preliminary injunction, and the Church and Endeavor cross-moved for summary judgment. In an opinion of July 25, 2000, *Penguin Books USA, Inc. v. New Christian Church of Full Endeavor, Ltd.*, No. 96 Civ. 4126, 2000 WL 1028634 (S.D.N.Y., July 25, 2000) (the "July 25 Opinion"), a partial preliminary injunction was granted, and the cross-motion for summary judgment was denied. The July 25 Opinion held that plaintiffs have established a *prima facie* case of copyright infringement in connection with the Work, that defendants' "public domain" affirmative defense survived summary judgment, and that Affirmative Defenses 1–6, 8–13 were dismissed. These defenses related to invalidity of the copyright due to divine authorship; fraud on the Copyright Office; unclean hands and copyright misuse; failure to allege chain of title; estoppel; infringement on freedom of religion; laches; no standing; abandonment; fair use; permissible quotation of fact only; uncopyrightability of facts; and that the *Course* was not copyrightable. The issue of prepublication distribution was reserved for trial.

On May 7, 2003, the Court determined motions *in limine* with respect to certain evidentiary issues. *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor*, 262 F.Supp.2d 251 (S.D.N.Y.2003).

In accordance with these rulings, the trial took place from May 19, 2003 to May 21, 2003. Final argument and submission were heard on June 25, 2003, at which time the case was considered fully submitted.

### The Issue

Based upon the July 25 Opinion, the factual issue remaining in the case was

---

1. The parties have submitted a stipulation dismissing plaintiff Penguin from this action, except for liability for damages and attorney's fees, in light of the expiration of the licensing agreement through which Penguin obtained rights to distribute the Work herein at issue.

whether or not prior to publication of the *Course* in 1975, those in possession of the *Course* distributed it. Even prior to the trial it had been established that a number of copies of the *Course* had been given to various people. The question, therefore, to which the trial was directed as framed by the defendants' Seventh Affirmative Defense was the extent of this distribution and whether or not that publication was general or to a select group for their review and comment.

As the factual findings to follow will demonstrate, mysticism, psychic phenomenon, and self-interest are revealed through the testimony of, and about, unusual people and events.

> If there were only one truth, you couldn't paint a hundred canvases on the same theme.

Pablo Picasso, quoted in Helene Parmelin, *Picasso Says* "Truth," tr.1969.

Notwithstanding Picasso, for copyright purposes, one truth must be found in order to resolve the instant dispute.

## I. *Findings of Fact*

### A. *The Source*

In 1965, Dr. Helen Schucman ("Schucman"), an associate professor of medical psychology appointed to the faculty of the College of Physicians and Surgeons of the Columbia Presbyterian Medical Center, began to hear the words of what she referred to as "It" or "the Voice." Schucman later identified this voice as "Jesus." In October 1965, Schucman reported that she heard from the Voice the words "This is *A Course in Miracles*. Please take notes"; Schucman then began to write down what she described as a form of "rapid inner dictation." (Tr. 66,384) Over the next seven years, she filled nearly thirty stenographic notebooks with words she received from the Voice—words that

would ultimately evolve into the Text, Workbook for Students ("Workbook"), and the Manual for Teachers, the three sections of *A Course in Miracles*.

Schucman was a clinical psychologist at Columbia Medical Center in New York City at the time she scribed the *Course*. Dr. William Thetford ("Thetford") was her superior and colleague. Schucman and Thetford collaborated working in private offices in "an air of secrecy." (Wapnick Tr. 374). Schucman dictated her scribed notes to Thetford, who then typed them. Eventually the manuscript totaled 1,500 pages and was placed into black thesis binders.

Schucman was embarrassed by her scribing and considered it her "guilty secret." (Tr. 65, 369, 426). She did not want her co-workers, professors in the psychology department at Columbia Medical Center, to know about the existence of the *Course*. Schucman and Thetford were afraid that their professional reputations at Columbia would be adversely affected if their professional peers found out about the *Course* and chose to keep it a secret. Both wrote and copyrighted articles prior to 1973, but never placed a copyright notice or restrictive legend on the manuscript.

### B. *The Distribution*

As the work began to take shape, Schucman and Thetford revealed the work to individuals who they believed would be interested in the intersection of the psychological and the spiritual realms of consciousness.

Hugh Lynn Cayce ("Cayce") was the founder of the Association for Research & Enlightenment (the "A.R.E."), an institute that was created to promulgate the teachings of his father, Edgar Cayce, a psychic who had experiences similar to those of Schucman and had "taken down" messages

of a spiritual nature. When Schucman experienced some personal difficulties and hesitance after hearing the "inner voice," Thetford contacted Cayce to seek his advice and counsel, and Schucman met with Cayce before she began to record the *Course*. Both she and Thetford found him to be very supportive in respect to the psychic and spiritual experiences that were making her so uncomfortable. Schucman and Thetford provided Cayce with a copy of an earlier version of the manuscript and solicited his feedback, and they wrote in a November 18, 1970 letter to Cayce, "We look forward to any further comments or suggestions which you may wish to offer, individually or collectively." (Def.Ex. D) Cayce's copy of the manuscript has been maintained in a locked room at the A.R.E. and was not made available to the general public.

Father Benedict Groeschel ("Groeschel") is a former priest, then a member of a Franciscan order, who had a doctorate in psychology, had studied under Thetford, had worked with Schucman at Columbia Presbyterian Medical Center Psychiatric Institute, and had an established interest in the relationship between mysticism or spirituality and psychology. He was given a copy of the Work in 1973. Groeschel testified that he was instructed by Schucman not to distribute the manuscript. Notwithstanding, he discussed it and made it available to Dr. Kenneth Wapnick ("Wapnick"). It was apparent to Groeschel that Schucman and Thetford did not desire that the manuscript be widely disseminated. He complied with their instructions not to give the manuscript to anyone. (Tr. 10, 58).

Calvin Hatcher ("Hatcher"), the administrative vice-president at Columbia Presbyterian Medical Center, was a very close friend of Schucman and Thetford and received the manuscript, probably in 1973.

(Tr. 379–380). It was assumed that he treated it as confidential, making no copies of the manuscript and not showing it to anyone.

Reverend Jon Mundy ("Mundy") was a Methodist minister interested in "new age" spirituality, and he was planning a doctoral dissertation on psychotherapy and spirituality. He received a copy of the manuscript from Schucman and Thetford some time in 1974, and he "was told in no uncertain terms not to show that to anyone." (Tr. 381).

Wapnick was a clinical psychologist, who between 1967 and 1972, directed a school for disturbed children and served as chief psychologist at Harlem Valley State Hospital. As a result of a religious conversion, in 1972 Wapnick sought to become a monk and, to accomplish that end, abandoned his Jewish faith and sought to become a Catholic. His conversion, reported to Groeschel, interested the latter, and they met. Wapnick had published an article about mysticism and schizophrenia, the thesis of which was that mystics are not schizophrenics and schizophrenics are not mystics. Groeschel arranged for an introduction of Wapnick to Schucman and Thetford in November 1972.

In May of 1973, after a trip to Israel, Wapnick went to the private offices of Schucman and Thetford and reviewed a portion of the manuscript. He was provided with a copy of the manuscript containing some 1,500 8 1/2 × 11 pages. Wapnick also testified that:

> I'm not sure if it was a direct statement, but it certainly was implicit that this was not to be shown to anybody. I knew that very, very well. This was not something I was going to tell people about. I was not going to tell my family or my friends about [it].

(Tr. 374–376).

Wapnick recommended editorial changes and reviewed the manuscript dur-

ing the spring and summer of 1973. Starting in or about the fall of 1973, Wapnick and Schucman began to work together on a comprehensive editing of the entire *Course,* ultimately spending 13 or 14 months reviewing the manuscript, and revising its grammar, paragraphing, headings, and the like. This editing process was completed in approximately February 1975. Subsequently, Wapnick became the founder and president of FACIM and, with his wife, constitutes its executive board.

On May 29, 1975, Dr. Douglas Dean ("Dean"), a physicist engineer, introduced Schucman, Thetford and Wapnick to Judith Skutch Whitson ("Skutch Whitson"), a key witness at the trial and ultimately perhaps the principal person involved with the use and development of the Work—Schucman having died in 1981 and Thetford in 1988.

Schucman and Thetford gave Dean an uncopyrighted copy of the *Course* at the same time that Skutch Whitson received her copy. Dean was a stranger to both Schucman and Thetford until the May meeting. He had very little relationship with Schucman after receiving the *Course,* and was simply the "conduit" between Skutch Whitson and Schucman and Thetford. (Tr. Trans.2734). Skutch Whitson was a teacher and lecturer at New York University on the science of the study of consciousness and parapsychology. She also ran a small non-profit organization, then known as the Foundation for Parasensory Investigation (later renamed the Foundation for Inner Peace), that raised funds for and otherwise supported parapsychological studies at universities and hospitals. She was a founding board member of the Institute of Noetic Sciences in California, which had been founded by astronaut Edgar Mitchell to further the study of psychological and mystical experiences. Skutch Whitson became the Chief Executive officer of FIP and her husband Robert Skutch ("Skutch") became its vice-president.

An empathy developed at the May 1975 luncheon meeting, and, according to Skutch Whitson, Schucman received guidance that Skutch Whitson was to play an important role in the evolution of the *Course.* After lunch Schucman and Thetford took Skutch Whitson to their offices where the blinds were pulled, and the door was locked. Wapnick was present. Schucman and Thetford described the process of developing the manuscript and Schucman's embarrassment. Skutch Whitson was permitted to take the seven thesis binders home with her to review. She carried them out in a shopping bag. On the way home she called Dr. Gerald Jampolsky ("Jampolsky"), a Stanford-educated psychiatrist with whom Skutch Whitson had a romantic relationship to tell him about the Work and offered to show it to Skutch, a businessman and writer, who had been a writer for many years of television plays and advertising copy.

In or about mid-June 1975, Skutch Whitson took the manuscript with her on a trip to California in the course of which she sought the reaction of a number of people to the Work. Prior to her trip, Skutch Whitson had advised James Bolen ("Bolen"), a publisher and founder of *Psychic Magazine* in 1969, a publication that addressed issues relating to parapsychology, ESP, and the philosophical nature of humankind, that she had come across a very interesting manuscript that she wanted him to take a look at, and that she was coming to California in the near future. The magazine had a developed readership of approximately 100,000. Bolen frequently received manuscripts that individuals sought to have published or excerpted.

Upon arrival in California, Skutch Whitson showed the manuscript to Bolen and related the story of how the Work had been prepared without identifying Schucman and Thetford. Bolen became interested and sought a copy. According to Skutch Whitson, she obtained permission from Thetford and Schucman to make a copy of the manuscript for Bolen with the proviso that it not be distributed nor its authors identified. Bolen sent the manuscript out to a copying service and arranged for three copies to be made, at a cost of approximately $50 to $75 each. Skutch Whitson returned and picked up both her original manuscript and the copy Bolen had arranged to be made for her and left the remaining two copies with Bolen who subsequently made one additional copy of the manuscript, which he and his partner, Mr. Hammond, marked up in the course of their review and discussion.

During her trip to California in mid-June of 1975, Skutch Whitson also gave a copy of the Work to Jampolsky because he was a trained professional in the field, and she wanted his opinion and feedback about the value of the manuscript. Consistent with Schucman's directive, Skutch Whitson instructed Jampolsky not to distribute the manuscript to anyone. Jampolsky complied fully with this instruction.

After this California trip, Skutch Whitson discussed the results with Schucman and Thetford. In her testimony she stated that they felt it was "alright to reduce the manuscript and Xerox it off and put it in whatever kind of binders temporarily." (Tr. 104) and that subsequently and also after her return from California that Schucman advised her that "he says it must be copyrighted." (Tr. 105).

In early July Skutch Whitson returned to California with a Xerox copy of the Course.

In July, Skutch Whitson also gave a copy of the Work to Dr. Edgar Mitchell ("Mitchell"), a former astronaut and the sixth man to walk on the moon in 1971. He was the founder of the Institute of Noetic Sciences, and Skutch Whitson was a member of the Institute's Board of Directors. Mitchell was engaged in parapsychological research at the time, which Skutch Whitson's foundation ultimately assisted in funding. Skutch Whitson met with Mitchell and sought his advice as to whether the Work was worth pursuing.

Also in July, Skutch Whitson gave a portion of the Work to James Hickman ("Hickman"), an associate of Skutch Whitson whom the Foundation for Inner Peace had sponsored in connection with a research trip to Russia.

David Hurt ("Hurt") was an engineer associated with the Stanford Research Institute ("SRI"). He worked at SRI with Russell Targ whom Skutch Whitson knew in connection with Targ's research regarding the outer reaches of human capability. At a luncheon in July or August of 1975, attended by Targ, Hurt, Skutch Whitson, Wapnick, Schucman, and Thetford, Hurt was provided with a number of pages from the manuscript of *A Course in Miracles* because of his particular interest in Schucman's experience in "scribing" the Work.

Evidence presented of statements made prior to this litigation support a finding that Zelda Suplee, a friend of Skutch Whitson, was given a copy of the uncopyrighted manuscript by Skutch Whitson, prior to the publication of the Criswell edition. Reed Erickson ("Erickson") received a copy from Suplee, which he used as a basis for study by a group in Mexico. Erickson was the backer of the first bound version of the *Course* where he donated 440,000 for the first printing.

Skutch Whitson gave or lent a manuscript copy to a religious professor, Paul Steinberg ("Steinberg"), for him to make a copy for himself. Saul Steinberg, a cousin of Steinberg's and a printer, was asked to runoff copies which were studied by his employees and family.

In late July of 1975, Schucman, Thetford, and Wapnick joined Skutch Whitson in California. (Skutch Whitson Tr. 129). The group spent approximately one month in California, meeting with various colleagues and friends of Skutch Whitson. In August 1975, Skutch Whitson organized a reception at 2000 Broadway in San Francisco, where Schucman and Thetford were introduced to a number of people. During this time period a number of copies were distributed, 100's, according to Skutch Whitson and Skutch as described below.

During the trip to California in mid-July of 1975, Skutch Whitson met briefly with her doctoral adviser, Dr. Eleanor Criswell ("Criswell"), who had a small printing company called Freeperson's Press. Criswell was a professor of psychology at the Humanistic Psychology Institute in California. Skutch Whitson was considering doing doctoral studies with Criswell as her advisor and made an appointment to discuss her possible doctoral studies on July 10, 1975. (Tr. 81, 122). Skutch Whitson was unsure whether she wanted to pursue her proposed doctoral thesis on a technology for developing extra-sensory perception in children or whether she was simply "drawn" by the *Course*, a "document that had come into my life in an unusual way." (Criswell Dep. p. 19, 100–01).

Skutch Whitson brought the *Course* to the meeting and Criswell offered to have it published through her personal publishing press, through which she had done publishing for students. Criswell advised Skutch Whitson that she would be willing to assist in having the manuscript published in a more protable and useful format.

Criswell took responsibility for the manuscript pages, and in August of 1975, they were taken to a Kopy Kat copy center in Berkeley to be reproduced. The book was not typeset or otherwise put into a new format; instead, the actual manuscript was reduced in size by photo-offset and bound in a four volume soft cover set. Consistent with Schucman's instructions, the softcover "Criswell Edition" of the Work bore a copyright notice indicating that the copyright was held by the Foundation for Inner Peace.

### C. *The Copyright*

The first edition of 100 copies of the Criswell edition was bound with a yellow cover with a copyright notice. The copyright application was filed on behalf of the Foundation of the Parasensory Investigation on November 24. The copyright application was filed by Skutch who had some prior experience with copyrights. It stated that the first publication was October 6, 1979. The copyright was registered by the Copyright Office on December 4, 1975.

Following distribution of the first edition, the defendants made a second Criswell edition with a white cover, and a third edition of the Criswell edition followed with a blue cover. The Criswell edition contained substantially fewer pages (two pages of the 8 1/2 × 11 original having been reduced to fit the size of one 8 × 11 1/2 page, resulting in smaller print) and was sold for $50.

### D. *The Publishing*

The Foundation for Parasensory Investigation changed its name to the Foundation for Inner Peace as a result of Schucman's distaste for the former name, according to Skutch Whitson. However,

the date of this name change was not accomplished until June 9, 1976.

In or about 1976, FIP itself began to publish *A Course in Miracles* in a set of three hardcover volumes—one containing the Text, the second containing the Workbook, and the third containing the Manual for Teachers. In 1985, FIP began publishing *A Course in Miracles* in a single softcover volume. In 1992, FIP began publishing the second edition of *A Course in Miracles* in a single hardcover volume. Each of these editions was published with copyright designation affixed.

In December 1995, FIP entered into a five-year licensing agreement with Penguin, pursuant to which Penguin was granted the license to publish and distribute *A Course in Miracles* in English in all territories except the United Kingdom. The version of the book published and distributed by Penguin was a single hardcover volume. The Penguin licensing agreement expired by its terms in or about December 2000.

On or about September 22, 1998 through a written transfer and license agreement approved by the Attorney General of the State of New York, FIP assigned and transferred to FACIM its right, title and interest in and to *A Course in Miracles* and its foreign translations, including its copyright interest therein. The transfer agreement was filed in the U.S. Copyright Office on April 1, 1999.

### E. *The Interests and Credibility*

The Church and Endeavor use the *Course* in their teaching and seek to have it freely available, including publication on the internet.

Skutch Whitson and her ex-husband, Robert Skutch, and Wapnick and his wife are the key figures in FIP and FACIM respectively.

Although it was Schucman's directive that only a non-profit foundation was to publish the *Course*, FIP assigned it to a for-profit company, Penguin, for $2.5 million dollars. Skutch Whitson and her family receive salaries, perks and benefits from FIP.

Wapnick's income is from his books, tapes and workshops, in which he talks about the *Course*, and from donations. He has published several writings that include excerpts of the *Course*.

Jampolsky also has an on-going financial arrangement to publish excerpted *Course* materials without having to pay royalties. He has had an intimate relationship with Skutch Whitson with whom he met three days before his third-party deposition.

Bolen has received consulting fees from FIP over the past years of approximately $25,000 a year. He was a consultant for 5–6 years and consulted up to early 2003, just prior to the trial, making between $12,000 and $25,000 a year. Additionally, he has a pending book deal with FIP to write a book on Schucman and Thetford that is in progress.

### F. *The Limitations*

The plaintiffs did not present any written evidence of any limitation upon the use of the *Course* when distributed, as found above. The evidence of oral limitation came from witnesses interested in upholding the copyright. From the facts as found above, it is a fair inference that Schucman and Thetford, for their own personal reasons, sought to limit the distribution and use of the *Course*.

However, after Skutch Whitson's California trips, the appeal of the *Course* to a wider audience became apparent, and certainly by the time of the initiation of the Criswell edition in August 1975, a decision was made, certainly by Skutch Whitson,

and presumably by Schucman, to copyright the work so that it might be distributed more broadly. There is nothing in this record to indicate that Schucman and Thetford had any objection to the registration and publication of the *Course*, nor is there any indication that they participated in it. The decision to copyright and thereby to control and profit by the distribution of the *Course* was made after the distribution of the xerox copies described above.

Skutch Whitson and Skutch were the initiators of the act of registration, although they possessed no formal rights in the property. The act of registration and distribution was not challenged by Schucman, Thetford or Wapnick, all of whom played a role in the creation of the *Course*. The mystical experience reported by Wapnick and Skutch Whitson was converted by Skutch Whitson into a property right.

Proceeds from the sale of the *Course* were paid to Schucman during her life and to her husband after her death. Despite Schucman's distaste for parasensory investigations, as testified to by Skutch Whitson, the name change from FPI to FIP did not occur until almost a year after the Criswell edition. Assuming that the Voice was the source of Schucman's decisions as conveyed to Skutch Whitson, the decisions had distinct economic implications.

Thereafter, but prelitigation, both Skutch and Skutch Whitson described the distribution of hundreds of xerox copies— Skutch in his book *Journey Without Distance*, Skutch Whitson in a number of transcribed interviews. Skutch's book, published by FIP, describes a distribution through Bolen but the distribution is denied by Bolen, overall a credible witness, and Skutch has no first-hand knowledge of the California trip and repeated in his book what he has been told by Skutch Whitson. However, it is fair to infer from the description of the July meeting that a

number of xeroxes were made and that the cost of the xeroxing was a motivating factor in developing the Criswell editions.

Skutch Whitson's prelitigation statements of the distributions of hundreds of xerox copies are found on various tapes made of her remarks. She admitted the authenticity of her voice but stated that the statements on the tapes concerning the distribution were false, explaining that "I was telling stories," and in answer to her counsel's question, she "embellished, exaggerated." (Tr. 211).

Skutch's statements about distribution which were contained in *Journey Without Distance*, were altered in the edition which was published subsequent to the initiation of this litigation. The alteration deleted references to the distribution of the xerox copies of the uncopyrighted *Course*.

From all the evidence, it is a fair inference that, as Skutch Whitson stated, on her second trip to California she permitted xeroxing "and it seemed very right that people would pass it along, copy it over and copy it over, until finally people's copies were getting so light, that they couldn't see them anymore, and a few of us got together and recognized the need to put it in some kind of a form that was easier to read. And out of that came very small little paperbacks that the print was so small you needed a magnifying glass." (Def. Ex. N, N1, counter No. 1B165–180). This 1977 statement accords with the facts of the second California trip and the initiation of the Criswell edition.

## II. Conclusions of Law

### A. Copyright Jurisdiction

▮ The parties agree that this Court possesses subject matter jurisdiction over this action under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* and that to succeed on a claim of copyright infringe-

ment under the Copyright Act plaintiffs must demonstrate (1) ownership of a valid copyright; and (2) unauthorized copying by the defendant. *E.g., Design Options, Inc. v. BellePointe, Inc.,* 940 F.Supp. 86, 89 (S.D.N.Y.1996). A certificate of registration from the United States Registrar of Copyrights constitutes *prima facie* evidence of the validity of the subject copyright, *see* 17 U.S.C. § 410(c), and once such a certificate has been presented, the burden shifts to defendants to rebut the copyright's presumptive validity. *Design Options, Inc.,* 940 F.Supp. at 89.

■■■ To establish their defense to infringement, defendants must demonstrate that the work was "published," as that term is used and defined in the copyright context, without copyright notice. *Kepner–Tregoe, Inc. v. Vroom,* 186 F.3d 283, 287–88 (2d Cir.1999). The showing of a work to a select group of people for a limited purpose (such as to seek commentary or criticism) does not constitute "publication" within the meaning of the copyright law, and is legally insufficient to place the work into the public domain. *E,g., Acad. of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.,* 944 F.2d 1446 (9th Cir.1991). In particular, the creator of a work has the right to show it to a limited class of people without jeopardizing the common law copyright, and, under such circumstances, the publication will be deemed "limited." *Id.* at 1451; *Procter & Gamble Co. v. Colgate–Palmolive Co.,* No. 96 Civ. 9123, 1998 WL 788802, at *38 (S.D.N.Y.1998).

■■■ Such a limited publication will be found where the publication was (1) to a definitely select group, (2) for a limited purpose, and (3) without the right of diffusion, reproduction distribution or sale. *White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir.1952); *Continental Casualty Co. v. Beardsley,* 253 F.2d 702, 706–07 (2d Cir.1958), *cert. denied,* 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958); *Procter & Gamble Co.,* 1998 WL 788802 at *38.

■■■ A work may enter the public domain through a general publication where the copyright holder acts in a fashion that exceeds the scope of this "limited publication." Thus, "[a] general publication occurs when a work is made available to members of the public regardless of who they are or what they will do with it." *Acad. of Motion Picture Arts and Sciences,* 944 F.2d at 1452; *see also Continental Casualty Co.,* 253 F.2d at 706–07.

### B. The Plaintiffs Have the Burden of Proof

The plaintiffs have established they hold a valid registered copyright in the *Course* via their certificate of registration granted in December 1975, *Penguin Books,* 2000 WL 1028634, at *15, which creates a presumption of first date of publication. The certificate of registration contains a date of October 6, 1975 as the date of first publication.

The Church and Endeavor have met their initial burden of proof to show that the *Course* entered the public domain or was "published" prior to October 6, 1975 without notice of copyright. *Kepner–Tregoe,* 186 F.3d at 287–88. *Acad. of Motion Picture Arts and Sciences,* 944 F.2d at 1451; *H.W. Wilson Co. v. Nat'l Library Serv. Co.,* 402 F.Supp. 456, 458 (S.D.N.Y. 1975).

■■■ "A general publication 'occurs when by the consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur.'" *Penguin Books*

*U.S.A.,* 2000 WL 1028634, at *16 (*citing Procter and Gamble Co.,* 1998 WL 788802, at *38 (S.D.N.Y.1998); Nimmer § 4104 at 4–20 (3d ed.1997)).

■ A distribution of a work to one person constitutes a publication. *Kakizaki v. Riedel,* 811 F.Supp. 129, 131 (S.D.N.Y. 1992); *Burke v. Nat'l Broad. Co., Inc.,* 598 F.2d 688, 691 (1st Cir.1979).

■ As found above, *A Course in Miracles* was published without notice of copyright prior to copyright registration i.e. was "published." Once a distribution or publication without notice of copyright prior to copyright registration has been established, the burden of proof shifts to the plaintiff, the holder of the copyright, to show that the publication or distribution of the work was for a limited purpose; and as such was legally insufficient to place the work into the public domain. *Kepner–Tregoe,* 186 F.3d at 287–88; *Acad. of Motion Picture Arts and Sciences,* 944 F.2d at 1451; *Procter & Gamble Co.,* 1998 WL 788802, at *38.

■ A publication that is not limited is general. *White,* 193 F.2d at 747; *Kakizaki,* 811 F.Supp. at 131. Specifically, to satisfy that a distribution qualifies as a limited publication, the plaintiffs must sustain their burden of proof to put forth evidence that the publication was (1) to a definitely select group, (2) for a limited purpose, and (3) without the right of diffusion, reproduction, distribution or sale. *White,* 193 F.2d at 746–47; *Continental Casualty Co.,* 253 F.2d at 706–07; *Procter & Gamble Co.,* 1998 WL 788802, at *38.

The plaintiffs must prove all three of the enumerated elements exist or else the distribution may not be deemed limited and the copyright will not be valid. *H.W. Wilson Co.,* 402 F.Supp. at 458; *Kakizaki,* 811 F.Supp. at 131.

## C. *The Group To Which Distribution Was Made Was Not Select*

A select group cannot be created by an author's "subjective 'test of cordiality.'" Thus, when works are given or sold to persons deemed "worthy" a select call is not created and the publication is not limited. When plaintiffs sell or give the Work to "congenial strangers" the Court is "unable to see in this picture any definitely selected individuals or any limited, ascertained group or class to whom the communication was restricted." *Schatt v. Curtis Mgmt. Group, Inc.,* 764 F.Supp. 902, 911 (S.D.N.Y.1991) (*quoting White,* 193 F.2d at 747). The process by which Schucman and Thetford decided whether an individual should receive the *Course* was completely subjective and done through a test of cordiality as to whether a particular person was worthy or ready for the *Course.* The decision that someone was ready to receive the work lacked objective qualification and was based on the anticipated interest in or effect of the *Course* on the recipient. It is not possible to ascertain what individuals were or would be part of a select or restricted class. An interest in spiritual experience fails to define a class adequately.

■ The common interest in the subject matter of a work, that is, in this case spiritual revelation, will not render the publication limited. *RPM Mgmt., Inc. v. Apple,* 943 F.Supp. 837, 842 (S.D.Ohio 1996); 1 M.Nimmer and D.Nimmer, *Nimmer on Copyright,* Sec. 413[A][1] (1996).

As found above, a number of unknown people received the uncopyrighted manuscript prior to publication without notice. The admitted recipients of the *Course* include Skutch Whitson, Wapnick, Hatcher, Hugh Lynn Cayce, his son, Herbert Puryear, Jampolsky, Bolen, Erickson, John Mundy, Dean, Father Groeschel, Ham-

mond, Steinberg, and his cousin Saul Steinberg, and Zelda Suplee.

### D. *The Distribution Was Not Limited as to Use*

As an initial matter, there is no evidence of a written limitation on use by either Schucman, Thetford or Skutch Whitson. There is no direct evidence of any limitation to distribution by Schucman and Thetford to Cayce, Puryear, Mundy, Dean, and Groeschel. Wapnick and Skutch Whitson, interested witnesses, did testify that they received their copies with the understanding that the *Course* was to be held in confidence and not further distributed without Schucman's permission. While Wapnick's testimony in this regard was unimpeached, Skutch Whitson's statements were contradicted by her actions, the telephone call to Jampolsky, the offer to make the *Course* available to Skutch, the transmittal to Bolen, and the subsequent review by Hammond.

As found above, after the first trip by Skutch Whitson to California, the decision to permit further distribution was made including the decision to copyright the *Course*. Meetings were held, and, as found above, additional xerox uncopyrighted copies were distributed as stated by Skutch Whitson in comments made two years later, statements that were consistent with later statements and remained uncorrected until repudiated in this litigation.

■ Even if the distribution of copies had been limited to a selected group, the publication will nevertheless be general, unless there is an express or implied limitation as to the specific purpose for which such copies may be used by the group to which it was distributed. *Kakizaki*, 811 F.Supp. at 131. Recipients' common interest in the subject matter is not a limited purpose. *White*, 193 F.2d at 747.

An author's lack of personal knowledge or friendship with persons that receive the work is indicative that a distribution was not limited as to the group or the purpose. *White*, 193 F.2d at 747.

At the time of distribution Schucman did not know or had not met James Bolen, Gerald Jampolsky, David Hammond, Herbert Puryear, Hugh Lynn Cayce's son, the Steinbergs, Reed Erickson or Edgar Mitchell. Additionally, Skutch Whitson, Wapnick, Mundy and Dean were virtual strangers to Schucman at the time she gave them or allowed them to have a copy of the *Course*.

The distribution of the uncopyrighted work must preclude recipients from reproducing, distributing or selling any copies. *Continental Casualty Co.*, 253 F.2d at 706–07.

■ A limited distribution cannot be a geographically limited distribution but is limited by the class or group of people a work is given to. *Acad. of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1452 (9th Cir.1991) (distribution only to winners of the Academy Award.); *Burnett v. Lambino*, 204 F.Supp. 327, 329 (S.D.N.Y.1962) (distribution to possible producers of a play for inducing production was to a limited group); *King v. Mister Maestro, Inc.*, 224 F.Supp. 101 (S.D.N.Y.1963) (distribution of speech to members of the press was to limited group for purpose of news reporting).

Skutch Whitson at trial sought to contradict her earlier statements on the audiotapes that (i) Schucman and Thetford did not object to the *Courses'* distribution in California; (ii) that 100's of people acquired copies in California; and (iii) people were running off copies as fast as possible, by asserting that these statements were merely oratorical hyperbole.

However, such distribution is consistent with the decision to end the alleged secrecy policy, to obtain a copyright and to initiate a photo-offset production. There is no evidence that anyone at the time of making the decision to copyright was aware, or had contemplated, the effect of pre-publication distribution. The publication date of October 5, 1975 not only binds FIP, but accords with the facts surrounding the production of the Criswell edition. From all the facts it must be inferred that all the interested parties intended to make the Work as available as possible without limitation.

### Conclusion

Based upon the facts as found above and the conclusions of law just set forth, judgment will be entered dismissing the complaint and granting judgment invalidating the copyright with costs to the defendants.

Submit judgment on notice. Upon entry of judgment a stay of ten (10) days will be granted to permit any further emergency proceedings.

It is so ordered.